IN THE UNITED STATES DISTRICT COURT  FILED
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION  02 FEB 28 PM 2:08

U.S. DISTRICT COURT
N.D. OF ALABAMA

LARRY IRBY,                      )
                                )
        Plaintiff,              )
                                )
v.                              )   CIVIL ACTION NO. 99-JEO-1185-M
                                )
CHANDELEUR HOMES, INC.,         )                **ENTERED**
                                )
        Defendant.              )   FEB 28 2002

## MEMORANDUM OPINION

In this action, the plaintiff, Larry Irby (hereinafter "Irby"), a former employee of the

defendant, Chandeleur Homes, Inc. (hereinafter "Chandeleur"), asserts that he was the victim of

race discrimination in his termination by Chandeleur in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e (hereinafter "Title VII").   Chandeleur has filed a motion for

summary judgment on all claims.  (Doc. 9).  A hearing on the motion was conducted on January

23, 2002.  Upon due consideration, the court finds that the motion is due to be granted.

## I. MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the declarations, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.

2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden

to show the district court, by reference to materials on file, that there are no genuine issues of

material fact that should be decided at trial.  Only when that burden has been met does the burden

shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

2

issue for trial." *Anderson*, 477 U.S. at 249.  A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983).  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 643 (11th Cir. 1997).  However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 254; *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255.  The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen*, 121 F.3d at 643.

3

### B. Facts[1]

#### 1. Background

Chandeleur is a mobile home manufacturer with three factories in Boaz, Alabama: Plant 1, Plant 2, and Plant 3. (Deposition of Randy Newman (hereinafter "Newman Depo.")[2] at 53-54). All three plants are located on contiguous property and have independent management except for "higher management." (*Id.* at 54). On August 21, 1997, Irby was hired as a Wall Setter by Thomas Lesley (hereinafter "Lesley"), Production Foreman for Chandeleur, to work in its Plant Number 1. (Deposition of Larry Irby (hereinafter "Irby Depo.")[3] at 58-59). Lesley was one of six production foremen at Chandeleur. (Affidavit of Steve Toms (hereinafter "Toms Aff.") at ¶¶ 1 & 2).[4] During his employment with Chandeleur, Irby worked in a four-person crew on an assembly line-like mechanism in which he and one of his crew members set the walls on the end of each house that was being built. (Irby Depo. at 59-61). Randy Newman was a Production Manager with the defendant at all three plants owned by the company. (Newman Depo. at 11, 54). Steve Toms was the Assistant Production Manager for Chandeleur. (Toms Aff. at ¶¶ 1 & 2). The production foremen reported to Toms. (Toms Aff. at ¶ 3).

The work environment in which Irby worked was fast-paced in order to meet production demands. In the event that a member of the four-person crew was absent, Chandeleur would

---

[1] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11ᵗʰ Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[2] Portions of Newman's deposition are found at document 10, exhibit 3 and document 16, exhibit L.

[3] Portions of Irby's deposition is found at document 10, exhibit 1.

[4] Toms's Affidavit is found at document 10, exhibit 5.

4

have to use a floater or a supervisor to temporarily fill in to meet production deadlines. (Newman Depo. at 49-50; Irby Depo. at 62). Chandeleur employed only four floaters for the over 300 jobs it had. (Newman Depo. at 49-50). It was very important to Chandeleur that the work groups were manned each and every day. (*Id*. at 23). This is, therefore, stressed at the time an employee is hired. (*Id*. at 23, 31-32).

## 2. Applicable Company Policies, Rules, and Practices

The defendant uses various documents to notify its employees of its policies, rules, and practices. These include an Employee's Handbook (hereinafter "Handbook") and individual documents that are provided to the employees early in their relationship with the defendant. These documents address absenteeism, tardiness, and notification when an employee is going to be late or absent. During the relevant time, the defendant had an articulated, written "Attendance Policy." It states:

> The purpose of this policy is to insure [sic] that each employee understands his or her responsibility in regards to attendance and tardiness.
>
> Please take note that every new employee hired by Chandeleur Homes, Inc. is employed under a ninety (90) day probationary period.
>
> 1.    Anyone being absent for any reason must notify his/her supervisor or the production manager (Do not leave a message with the receptionist) by 7:15 a.m. of that day.  You are required to call in every working day and inform your supervisor of your status.  Failure to do so will be grounds for termination.
>
> 2.    Two (2) unexcused absences is proper cause for termination.
>
> 3.    Three (3) days of tardiness is cause for termination.
>
> 4.    Any combination of one (1) unexcused absence and two (2) days of tardiness is proper cause for termination.
>
> 5.    An excused absence is:
>
>>       A.    Death in the family.
>>             Family is: wife, child, mother, father, sister or brother.
>>       B.    Sickness with a Doctor's excuse.

5

C.      An approved leave of absence (ex. Military Duty).

Any other reason will have to be approved by the Production Manager.

6.      Excuses must be brought in on the day you return to work to be valid.

7.      Doctor's excuses will be accepted until they are abused or become excessive and a burden on your co-workers and the Company.

8.      From 7:01 a.m. is tardy and anything after 11:00 a.m. is absent.

9.      This policy will be enforced without EXCEPTION, SO PLEASE DON'T ASK US T0 MAKE ANY!

10.     Anyone who does not fully understand any part of this policy should ask his or her supervisor to explain it to him or her in detail because ignorance of the rules will not be accepted as a reason for not complying with them.

(Doc. 16, Ex. D) (emphasis in original).  According to the Handbook, this Policy was posted on the defendant's bulletin board.  (*Id*. at 15).  Each employee was also provided a copy of the same to be signed and placed in his or her personnel file. (Newman Depo. at 18).  Newman stated that the "Attendance Policy" is not absolute in that the listed violations "could be grounds or can be grounds for" termination, but "[t]here are exceptions to the rule."  (Newman Depo. at 20).  Decisions are made on a case-by-case basis.  (*Id*.).

The Handbook also lists examples of "employee misconduct which may result in disciplinary action up to and including discharge, depending on the circumstances."  (Doc. 16, Ex. C, p. 16).  The introduction to the Handbook states that the list is not intended to be "all inclusive;" it "merely suggests areas which would be considered misconduct and provides the basis for disciplinary action."  (*Id*.).  It further states that "[d]isciplinary action will range from verbal warning to discharge.  In deciding what action will be taken, the Company will, among other things, consider the seriousness and/or frequency of the infraction."  (*Id*.).  The list, in pertinent part, provides:

6

**Group A Work Rules**

. . . .

2) Failure to report absence within one (1) hour of start of shift.

. . . .

**Penalties for Violations of Group A Work Rules**:

| Offense Frequency | Penalty For All Rules | Additional Penalties Unexcused Absence |
|---|---|---|
| First | Verbal Warning (Note in File) | One (1) day against attendance bonus |
| Second | Written Warning (In File) | One (1) day against attendance bonus |
| Third | Written Warning (Counsel) | Two (2) days against attendance bonus |
| Fourth | Discharge (Written Report in File) | None |

**Group B Work Rules**

. . . .

10) Abusive or indecent language directed at another employee

. . . .

**Penalties for Violations of the Above Work Rules**:

| First Offense: | Two (2) days off without pay and a written notice in file |
|---|---|
| Second Offense: | Discharge with complete written report in file |

**Group C Work Rules**

The following acts or conduct are prohibited.

. . . .

4) Intimidating, threatening, or coercing employees or supervisors verbally or physically or with a threat or act of exposing a weapon, such as a knife, gun, club, bottle, etc., or through the threat of violence to any physical or real property of his/her family.

. . . .

**Penalties for Violations of the Above Work Rules**:

First Offense:     Discharge without warning.

(*Id.* at 17-20).

Employees are also given another document: "Summation of Possible Termination Conditions." It provides that the purpose of the document is "to state, in writing, some of the actions which may be grounds for possible or immediate termination." (Doc. 16, Ex. B, CI0029). It lists fourteen items, including "[w]ill[ful] insubordination to proper authority," "[a]bsence from work for more than two days without notice," and "[f]requent tardiness or absence from work without notice." (*Id.*).

Lesley testified that, as far as he knew, the "Attendance Policy" was for all the employees. (Lesley Depo., p. 80). It was written after the Handbook. (Newman Depo. at 28). It is also followed in lieu of the Handbook with regard to not calling in. (*Id.* at 29). Newman also stated that this was stressed at the time a new employee is hired. (*Id.* at 31-32).

### 3. Irby's Situation

When he was hired, Irby received and signed Chandeleur's Attendance Policy and the Summation of Possible Termination Conditions. (Irby Depo. at 69). As just discussed, these materials provide that employees must notify their supervisors by 7:15 a.m., fifteen minutes after the scheduled start of their shift, if they plan to be absent on that day. (*Id.* at 69-70; Doc. 16, Ex. B (Attendance Policy)). Furthermore, the Attendance Policy states that two or more unexcused absences are grounds for discharge. (Doc. 16, Ex. B). According to Lesley, missing two straight days without calling in by 7:15 a.m. each day to report the absence is grounds for discharge. (Lesley Depo. at 96-98). Additionally, Chandeleur's Employee Handbook states that excused

absences, including medical injuries do "not eliminate the need to notify your foreman within one (1) hour of the start of the shift when you'll be out. We must know by 7:00 a.m." (Doc. 16, Ex. C, p. 10).

Prior to the dates at issue in this case, during his employment with Chandeleur, Irby was absent from work on December 12, 1997, December 13, 1997, and February 23, 1998. (Affidavit of Thomas Lesley (Lesley Aff.) at ¶ 2).[5] Irby called in by 7:15 a.m. on the mornings of December 12 and 13, and, therefore, was excused for these absences. (*Id.*). Irby did not call in by 7:15 a.m. on February 23, but Lesley excused him because Irby reported that he was in jail and unable to call in by the deadline.[6] (*Id.* at ¶ 3). Lesley did not withhold his bonus for this violation.

On the morning of March 3, 1998, Irby woke up with a swollen right ankle. He had significant difficulty walking on it. (Doc. 16, Ex. A (Affidavit of Larry Irby (hereinafter "Irby Aff.")) p. 1). He was able to dress. He started to go to his car to see a doctor. However, he learned that his car had been repossessed during the previous night. (*Id.*). He did not have a telephone. (*Id.*). Because he had no phone or car, he had to wait for his girlfriend to check on him – something she did daily. She came by later that day. They made arrangements to take him to the doctor the next morning. (*Id.*). Irby did not call the defendant or any of its representatives at any time that day.

When Irby did not show up for work or call in, Lesley called Irby's grandmother and

---

[5] This affidavit is found at document 10, exhibit 4.

[6] At the oral argument on the motion, counsel for the plaintiff stated that the plaintiff disputes that he was in jail on this occasion. Counsel for the defendant read from the plaintiff's deposition, which was not in the record or otherwise offered at the hearing, wherein the plaintiff stated that he did not recall being in jail. This is inconsequential in the court's consideration of this matter since it is not disputed that he did not come to work that time on one, not two consecutive days.

girlfriend on that first day.  They were the contact persons Irby had given the defendant.  (Lesley

Depo. at 33; Irby Depo. at 74 & 80).  Lesley contacted Irby's girlfriend and personally "told her

that [he] needed to speak with [Irby] today and, if he would, to please return [his] call and let

[him] know where he was."  (Lesley Depo. at 33).  Irby did not remember whether his girlfriend

told him that Lesley called.  (Irby Depo. at 74).  Lesley did not receive a return call that day.  (*Id.*

at 33).

On March 4, 1998, Irby did not show up for work and failed to call in before 7:15 a.m.

Lesley discussed the situation with Randy Newman.  (Lesley Depo. at 52; Newman Depo. at 16).

Newman told Lesley to wait until after lunch to see if they heard from Irby.  (Lesley Depo. at 52-

53).

Irby's girlfriend took him to the doctor on March 4, 1998, where he was treated for what

he believes was a spider bite.[7]  The doctor provided him with a medical excuse for work for

March 3 and 4.  (Irby Depo. at 97; Irby Aff. at 1; Lesley Depo. at 37-39).

At approximately 1:30 or 2:00 p.m. on the same day, Irby was replaced by Stacey Grimes,

a white male, who showed up at Chandeleur looking for work.  (Lesley Depo. at 33).  Lesley

hired Grimes because Lesley felt he was qualified by previous experience.  (*Id.* at 33,

35-36, 52-54).  Newman believed he approved the hiring of Grimes.  (Newman Depo. at 14).

Irby's girlfriend took him home after seeing the doctor and then proceeded to deliver the

doctor's excuse to the defendant sometime during the late afternoon of March 4.  (Irby Depo. at

97; Lesley Depo. at 36-38).  The note was dated March 4, 1998.  After receiving the excuse,

Lesley called the Rapid Care Clinic to verify the medical excuse; he was informed that Irby

---

[7] The doctor's notes state that he was there about 1:30 p.m. (Doc. 10, Irby Depo., Def. Ex. 5).

visited the clinic earlier that day (March 4, 1998). (Lesley Depo. at 38-39).

On the third day, March 5, 1998, Irby went to Chandeleur around 9:00 or 9:30 a.m. Lesley informed Irby that he was discharged for his failure to report to work on March 3 and 4, 1998, and for failing to call in by 7:15 a.m. on those days. (Lesley Depo. at 28, 40). Irby was told that Chandeleur had hired a replacement worker to fill his job. Irby asked to speak to Randy Newman, Chandeleur's Production Manager, and did so. Newman informed Irby that he was discharged because he failed to report by the early afternoon of March 4.

On or about March 31, 1998, Irby filed a charge of discrimination with the EEOC and the Commission issued a Notice of Right to Sue on or about February 16, 1999. This action was filed on May 12, 1999.

Irby testified that while he was working at the facility, Lesley treated him no differently than he treated the other employees. Irby also stated that, other than his discharge, Lesley never did anything to him which he considered to be racially motivated. Irby likewise confirmed that he had never heard Lesley or any of the other supervisors use any racial slurs. He never returned to the company after March 5, 1999, seeking reemployment.

### 4. Potential Comparators

#### a. Jason Goss

Goss was a white employee who was fired by Lesley for missing two consecutive days without calling. (Lesley Depo. at 94-95).[8]

---

[8] According to Irby, an employee named Jonathon or Jason was out of work for at least a week without calling. When he returned to work after three weeks, he was not terminated. (Irby Aff., p. 3). It is not apparent whether this person Irby describes is Jason Goss or another employee. The court also notes that the value of this evidence is questionable because it involves a supervisor other than Lesley or Toms. (*See* pp. 20-22 herein).

11

### b. Van Hill

Hill was a white employee who, according to his termination report, last worked on

Thursday, February 3, 2000. He did not show up for work on February 4, 2000. His relationship

with the defendant was terminated according to the report when he voluntarily quit for no

apparent reason by never showing up again. The "Termination Report" was prepared on

February 8, 2000. (Doc. 16, Ex. D; Lesley Depo. at 94-96).

### c. Jerry Ellis

Ellis was a white employee who, according to his termination report, worked on July 31,

1995, and had to go to court on August 1, 1995. He was arrested when he went to court and

could not return to work. He was terminated on an unspecified date by his supervisor, Mark

Jones. It was noted on the form that Ellis would be "considered for rehire when an opening

comes up." (Doc. 16, Ex. E at CI-0533). He returned to the company at some unspecified time

and worked until April 16, 1998, when he did not return for two and one-half days. The

"Comments" section of the termination report states:

> Employee was out for 2½ days. He was told to call me (Mark Jones) when he got
> back from his Doctor. He didn't call for the whole time he was out. He has been
> given a written warning & also verbal warnings about this. After I said something
> to him about getting written up again about this, & that I was going to pull his
> bonus for a day, he got mad, he got in my face and was telling me what he was
> and was not going to do, so I told him he was fired.

(*Id.* at CI-0532).

### d. Keith Brown

Brown was a white employee who, according to a "Bonus Violation Report" was out on

September 9, 1999, did not call in and did not have an excused reason for being out. (Doc. 16,

12

Ex. F). As a consequence, his bonus was "pulled" on September 10, 1999, by his supervisor, Keith Hill. The approving production manager was Toms.

### e. Shannon Bridges

Bridges, a white male, started working for the defendant on August 19, 1996. He was terminated one week later, on August 26, 1996, when it was determined that he violated company policy by failing a drug test. (Doc. 16, Ex. G; Lesley Depo. at 74). He was rehired at an unspecified time. (Lesley Depo. at 74). His bonus pay was "pulled" for one week on an unspecified date when he did not properly secure some wires in a roof. (Doc. 16, Ex. G; Lesley Depo. at 74-75). He was also given a "Warning" for a violation of the defendant's policies on November 11, 1997, after he was out of work on the day before without a doctor's excuse, although he did call in. (Doc. 16, Ex. G; Lesley Depo. at 75). He was warned by Lesley that if this occurred again, he would lose his bonus pay for two days. (Doc. 16, Ex. G, at CI-1193; Lesley Depo. at 75). The warning was approved by Steve Toms.

On March 10, 1998, Bridges received another "Warning" and another "Bonus Violation Report" because he was absent the day before without a doctor's excuse. He did not call in. The "Warning" stated that "the next time he is out & does not call in or is out without a [doctor's] excuse, he w[ould] be terminated." (Doc. 16, Ex. G, CI1188). The "Warning" was approved by Lesley and the "Bonus Violation Report" was approved by Lesley and Toms.

Bridges was late again on March 12, 1998. As a consequence he received another "Warning" and "Bonus Violation Report." His bonus pay was "pulled" for one day. The "Warning" states that the next time he was late, absent without a doctor's excuse, or fails to call in, he would be terminated. (*Id*. at CI1183; Lesley Depo. at 73). The "Warning" and the

13

"Report" were approved by Lesley. Toms also approved the "Report."

On October 27, 1999, Bridges received another "Bonus Violation Report" when he was out on October 25, 1999, without a doctor's excuse. The "Report" was approved by Lesley and Toms. Bridges received two additional "Bonus Violation Report[s]" on January 25, 2000, and May 3, 2000, when his work was unsatisfactory. His bonus pay was "pulled" on both occasions. The "Reports" were approved by Lesley and Toms. Bridges was laid off on September 18, 2000, due to a lack of work. (Doc. 16, Ex. G; Lesley Depo. at 76).

### f. Stacy Grimes

Grimes was hired to replace Irby on the afternoon of the second day that Irby was gone. (Lesley Depo. at 60). While on 90 days probation, Grimes was absent without a doctor's excuse on March 17 and 18, 1998. (Doc. 16, Ex. H). His bonus was "pulled" as a consequence. (Lesley Depo. at 60-62). This action was approved by Lesley and Toms. He was also late on April 7 and 9, 1998, resulting in his bonus being "pulled" for one day. He was warned that if he was late again within the next six months, he would be terminated. This action was approved by Lesley and Toms. In both incidents, Grimes called in each morning. (Lesley Depo. at 67). If he had not, Lesley would have terminated him. (*Id.*). Grimes quit without providing a reason on April 17, 1998. (Doc. 16, Ex. H, at CI-0773; Lesley Depo. at 62).

### g. David Goble

Goble, a white employee, was absent from work on February 9, 10 & 11, 1998. However, according to Lesley, he called in each day. (Lesley Depo. at 94). He did not have a doctor's excuse when he returned. (Doc. 16, Ex. I; Lesley Depo. at 78). According to the "Warning" and "Bonus Violation Report," Lesley talked with Goble about the absences when he

14

returned and chose to let him continue working with the understanding that he would be terminated the next time he misses work without a doctor's excuse. (Lesley Depo. at 78). Lesley signed Goble's "Warning;" it was approved by Toms.

On June 22, 1998, Goble was absent without a doctor's excuse again. Because it was his fourth unexcused absence, he was terminated on June 23, 1998. (Lesley Depo. at 78). He was rehired on March 18, 2000, and terminated again on March 27, 2000, for personal reasons. (Doc. 16, Ex. I).

**h. Randy Gaylor**

Gaylor, a white employee, was absent on April 5, 1996, and did not have a doctor's excuse. The "Bonus Violation Report" states that his bonus was "pulled" for one day. The "Report" was approved by Lesley and the production manager.[9] (Doc. 16, Ex. J). Gaylor was late again on November 18 and 19, 1996. His bonus pay was "pulled" for both days. The "Bonus Violation Report" noted that he had been written up four times in the past for being late. (*Id.*). This report was approved by Lesley and Toms. (*Id.* at CI1084).

Gaylor was terminated on April 7, 1997, after he was late because he failed to properly set his clock. (Doc. 16, Ex. J, CI1078). His "Termination Report" lists excessive tardiness or absenteeism as a basis for his termination. (*Id.*). Even though Lesley prepared the report on April 7, 1997, it states in the comment section that Gaylor was late again on April 11, 1997. (*Id.*).

**i. Larry White**

White, a white employee, missed work on April 27 & 28, 2000, and did not call in by

---

[9] The production manager's name is not legible. (Doc. 16, Ex. J, CI1083).

7:15 a.m. (Doc. 10, Ex. 4 (Lesley Affidavit) at ¶ 5). When he called in around lunch time on the 28th and told Lesley that he was in jail, Lesley discharged him stating that being in jail was no excuse for failing to call. (*Id.*).

### j. Bobby Moore

Moore, a black employee, missed work on March 30, 1998. He was not terminated when he did not bring in a doctor's excuse because he called Lesley by 7:15 a.m. His (Moore's) bonus was "pulled" for a day due to his failure to work that day. (Lesley Affidavit at ¶ 6).

### k. Andy Watts

Watts, a white employee, was terminated by his supervisor, Keith Hill, on January 29, 1998, for missing two consecutive days and failing to call. (Toms Aff. at ¶ 3).

## II. TITLE VII ANALYSIS

### A. Generally

The sum and substance of the plaintiff's complaint in this court is that he was terminated because of his race. The plaintiff must demonstrate "intentional discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). The Supreme Court has stated unequivocally that "[p]roof of discriminatory motive is critical" in a disparate treatment case. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335-36 n.15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977). *See also United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983); *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 528-29 (11th Cir. 1983).

The plaintiff carries the initial burden of establishing a *prima facie* case of discrimination.

16

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). He

can establish a *prima facie* case under Title VII by showing: (1) that he was a member of a

protected class (black); (2) that he was qualified for the position at issue; (3) that an adverse

employment action was taken against him; and (4) that the employer treated similarly situated

employees outside the protected class (white employees) more favorably. *Spivey v. Beverly

Enterprises, Inc.*, 196 F.3d 1309 (11th Cir. 1999); *See, e.g., Maniccia v. Brown*, 171 F.3d 1364,

1368 (11th Cir. 1999); *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1310 (11th Cir.),

*superseded in part*, 151 F.3d 1321 (11th Cir. 1998); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th

Cir. 1997); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).

     If the plaintiff succeeds in establishing a *prima facie* case, the defendant only has the

burden of articulating or producing evidence, but not persuading, that the plaintiff was

disciplined or terminated for a "legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 253;

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113. S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

*See also Chambers v. Walt Disney World, Co.*, 132 F. Supp. 2d 1356 (M.D. Fla. 2001) ("If a

plaintiff establishes a prima facie case of discrimination, the defendant employer must articulate

a legitimate, nondiscriminatory reason for the challenged employment action.") quoting

*Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)). Once the defendant

articulates a "legitimate, nondiscriminatory reason" for its actions, any presumption of

discrimination arising out of the *prima facie* case "drops from the case." *Burdine*, 450 U.S. at

255 n.10; *Hicks*, 509 U.S. at 507. The court "must, in view of all the evidence, determine

whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory

reasons to permit a reasonable fact finder to conclude that the employer's proffered "legitimate

17

reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1997) (citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). This must include an evaluation of "whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence.'" *Combs*, 106 F.3d at 1538. If it is "determine[d] that a reasonable jury could conclude that the employer's articulated reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action." (*Id.*).

The defendant asserts that the plaintiff cannot establish that white employees who committed similar infractions were treated differently. To the contrary, it asserts that the evidence shows that other white employees (Goss, Van Hill, and White) were similarly disciplined. (Doc. 11, p. 10). The plaintiff asserts that (1) he has not violated the defendant's rules and (2) that his conduct was similar to that of other white employees (Van Hill, Ellis, Brown, Bridges, Grimes, Goble, and Gaylor), but was punished more severely than was theirs. (Doc. 15, pp. 12-13). In its reply brief, the defendant contends that (1) it terminated Irby for a legitimate, non-discriminatory reason, (2) white employees were treated similarly, (3) racial animus played no role in the decision, and (4) the plaintiff cannot compare himself to employees who violated different, dissimilar infractions. (Doc. 17).

18

## B. Prima Facie Case

In the present case, it is uncontested that the plaintiff has met three elements of a prima

facie case. The plaintiff is part of a protected class under Title VII; he was qualified for the

position; and he was subjected to an adverse employment action when he was terminated.

Accordingly, the issue is whether he has met the fourth element requiring that he show that the

defendant "treated similarly situated [white] employees more favorably." *Maniccia*, 171 F.3d at

1368.

This court must first determine what it means in this case to be "similarly situated." The

court in *Maniccia* stated:

> "In determining whether employees are similarly situated for purposes of
> establishing a prima facie case, it is necessary to consider whether the employees
> are involved in or accused of the same or similar conduct and are disciplined in
> different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311
> (11th Cir.), opinion modified by 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*,
> 115 F.3d 1555, 1562 (11th Cir. 1997)). "The most important factors in the
> disciplinary context are the nature of the offenses committed and the nature of the
> punishments imposed." *Id.* (internal quotations and citations omitted). We
> require that the quantity and quality of the comparator's misconduct be nearly
> identical to prevent courts from second-guessing employers' reasonable decisions
> and confusing apples with oranges. *See Dartmouth Review v. Dartmouth College*,
> 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary,
> but the cases must be fair congeners. In other words, apples should be compared
> to apples.").

*Maniccia*, 171 F.3d at 1368-69. Thus, in a case such as the present one that involves employee

discipline, the issue is whether the other employees are "similarly situated" for comparative

purposes. This will be the situation only if their conduct is "nearly identical" in relevant respects

to that of the plaintiff. The burden is on the plaintiff to show that similarly situated employees

were not treated equally. *See Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989). In making

19

this determination, "the court must consider whether the employees involved in or accused of the same or similar conduct were disciplined in different ways." *Gaston v. Home Depot USA, Inc.*, 129 F. Supp. 2d 1355, 1269 (S.D. Fla.), *aff'd*, 265 F.3d 1066 (11th Cir. 2001) (Table). "The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed." *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir.) (quoting *Holifield*, 115 F.3d at 1562), *cert. denied*, ___ U.S. ___, 122 S. Ct. 402, 151 L. Ed. 2d 305 (2001).

As already noted, Irby has pointed to numerous other employees, namely Van Hill, Jerry Ellis, Keith Brown, Shannon Bridges, Stacy Grimes, David Goble, and Randy Gaylor, whom he contends are similarly situated employees of another race that Chandeleur treated more favorably. Since Irby was terminated for missing two consecutive days and failing to call in by 7:15 a.m. on those mornings, the court finds that a similarly situated employee would be one that missed two or more consecutive days of work and failed to call in by 7:15 a.m.

Keith Brown, Shannon Bridges, and Randy Gaylor are not similarly situated employees because none of them missed two consecutive days of work. Furthermore, while Stacy Grimes and David Goble did miss two consecutive days of work, Irby has provided no evidence that either of these employees failed to call in by 7:15 a.m. to report those absences. Therefore, the plaintiff has failed to prove that Stacy Grimes or David Goble are similarly situated employees.[10] While plaintiff has provided evidence that shows Van Hill missed two consecutive days of work and failed to call in to report these absences by 7:15 a.m., Irby has failed to provide any evidence

---

[10] The court notes that while some of these individuals did not have exemplary work histories, their violations did not include the specific "two day, no call" violation that resulted in the plaintiff's termination. By way of example, Bridges had a number of violations for failing to bring in a doctor's excuse, but they were not consecutive days.

that Van Hill was treated more favorably. Indeed, the evidence indicates that Hill was terminated on February 8, 2000, the second day he was absent. (Doc. 16, Ex. D, p. 2 (Termination Report)). The court fails to see how, under these circumstances, the plaintiff has demonstrated that Hill was treated more favorably.[11]

The only other employee that Irby points to as being similarly situated is Jerry Ellis. Ellis missed two consecutive days of work and failed to call in by 7:15 a.m. Chandeleur's termination report for this employee shows Ellis's supervisor, Mark Jones, "was going to pull his bonus for a day, [but] he got mad, he got in my face, and was telling me what he was and was not going to do. So I told him he was fired." (Doc. 1, Ex. E, CI0532). Chandeleur argues that Ellis is not a similarly situated employee because Ellis worked for a different supervisor and never worked for Lesley, Irby's supervisor. Chandeleur relies on *Jones v. Gerwens*, 874 F.2d 1534, 1541-42 (11th Cir. 1989), as authority for this proposition.

In *Jones*, an African-American police officer brought an action claiming that he was treated differently than other officers when he was disciplined for the unauthorized use of a police vehicle (a truck) and related violations. Jones alleged that other officers and another supervising sergeant also used the truck in unauthorized ways. The court stated that these other incidents were inapposite "absent any evidence that [the disciplining Chief of Police] and Sergeant . . . **knew** of such transgressions. *Jones*, 874 F.2d at 1541 (emphasis added). The court further stated, "For the purposes of this Title VII action, [the other sergeant's] previous tolerance

---

[11] The plaintiff argues that the defendant waited three, four, or five days before taking action against Van Hill. (Doc. 15, pp. 5-6, 12-13). However, the undisputed evidence is that Van Hill last worked on Thursday, February 3, 2000. (Doc. 16, Ex. D, p. 2 (Termination Report)). Because the plant was not operating on Friday, Saturday, or Sunday, he was required to report to work on Monday, February 7, 2000. He did not show up for work and did not call. He did not come in or call on the next day, Tuesday, February 8, 2000, and was terminated. (Lesley Aff. at ¶ 4).

of Unit truck use for personal business would be relevant only if it could be shown that either [of the officers imposing the discipline in the plaintiff's case] **knew** of such practices **and did not act** to discipline rule violators." *Jones*, 874 F.2d at 1542 (footnote omitted) (emphasis added). In *Anderson v. WBMG-42*, 253 F.3d 561, 565-66 (11th Cir. 2001), the court, in response to a defendant's argument that a plaintiff cannot prevail as a matter of law whenever two different supervisors are involved in disciplining the plaintiff and comparators, stated in dicta:

> We . . . reject [the defendant's] position that *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) and *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998), *opinion modified by* 15 F.3d 1321 (1998), stand for the proposition that whenever two different supervisors are involved in administering the disciplinary actions, the comparators cannot as a matter of law be similarly situated for Title VII purposes.
>
> . . .
>
> Neither of these cases, however, support a broad assertion. *Bessemer* specifically indicated evidence of different supervisors' involvement in the disciplinary process is not determinative of the question. 137 F.3d at 1312 n.7 ("Different supervisors may have different management styles that – *while not determinative – could* account for the disparate treatment that employees experience.") (emphasis added). In *Gerwens*, we said that, under the circumstances there, different supervisors "*may* not be comparable" for the purposes of Title VII analysis. 874 F.2d at 1541 (emphasis added).

253 F.3d at 565-66. Therefore, even though Ellis and Irby were disciplined by different supervisors, this fact alone does not prevent Ellis from being a similarly situated employee.

There is no dispute that Mark Jones was Ellis's supervisor. However, he was not the plaintiff's supervisor and there is no evidence that he was involved in the supervision of the plaintiff. Additionally, there is no evidence that upper management, particularly Toms or Newman, was involved in or even aware of the decision to terminate or not to terminate Ellis.[12]

---

[12] The same is true of Lesley.

To the contrary, the termination report clearly shows that this decision was made on the spot by Jones. Still further, there is no evidence that the different treatment of the situations was precipitated by any action, direction, policy or practice of upper management.[13] The plaintiff has not shown that his decision makers were aware of the leniency that could have been shown Ellis and failed to correct the same. Accordingly, under the peculiar facts presented, Ellis cannot be considered a comparator.[14]

### C. Legitimate, Nondiscriminatory Reason

Assuming that the plaintiff has demonstrated a *prima facie* case of race discrimination, the burden then shifts to the employer to respond with a legitimate, nondiscriminatory reason for its actions. *Combs*, 106 F.3d at 1527-28 (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 92 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973)). As already stated, Chandeleur asserts that Irby was discharged because he missed two consecutive days of work and failed to call in by 7:15 a.m. to report the absences. Having demonstrated a reason for its action, the plaintiff must now "cast sufficient doubt on the defendant's proffered nondiscriminatory reason[ ] to permit a reasonable fact finder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct." *Combs*, 106 F.3d at 1538.

The plaintiff asserts that his "termination is in conflict with the written Company

---

[13] The evidence before the court demonstrates an absence of any company policy or practice supportive of a *prima facie* case since Watts, a white employee was terminated by his supervisor, Keith Hill, when he missed two consecutive days without calling. (Toms Aff. at ¶ 6). Lesley also terminated Goss, a white employee, when he missed two days without calling. (Lesley Depo. at 94-95). Although Lesley testified that the attendance rules were to be applied to everyone as far as he was concerned (doc. 16, ex. K, p. 80), Jones's decision regarding Ellis is insufficient to demonstrate a *prima facie* case under the present circumstances.

[14] The court also notes that in 1995, Ellis missed two days when he was arrested and had to go to court. He was terminated, but rehired at some unspecified date. No company rule prevented the rehiring of Ellis or the plaintiff for that matter. However, there is no evidence the plaintiff reapplied at any time after his termination.

policies," that the defendant "was more liberal in applying [its policies]" in favor of non-minorities and that it "ben[t] the rules in favor of non-minority employees such as Van Hill and Jerry Ellis." (Doc. 15, p. 13). This, he asserts, makes the defendant's conduct suspect.

Regarding the plaintiff's first assertion about the defendant's policies, the court finds that the defendant's attendance policies and procedures are not the paragon of clarity. However, that does not satisfy the *Combs* requirement that the plaintiff demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employers proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridian v. E.I. Dupont De Nemours & Co.*, 100 F.3d 161, 1072 (3rd Cir. 1996 (en banc)).

The court agrees that the plaintiff's situation, missing two consecutive days without calling in by 7:15 a.m., is not specifically and expressly addressed in the various rules. However, the issue is whether the defendant's actions in this case were such that summary judgment is precluded.

The defendant asserts that Brown, Bridges, Grimes, Goble, and Gaylor committed different infractions than Irby. (Doc. 17, p. 9). It also states that white employees, Hill, Gross, and White, were discharged for the same infraction as Irby. (*Id.*; Doc. 11, pp. 10-11). Thus, it asserts that this demonstrates that factors other than race contributed to the difference in the treatment between Irby and the others. (*Id.*). The defendant does not site any authority for this last proposition.

The fact that the defendant distinguishes between a Group A violation, such as when an employee fails to report a single absence within one hour (doc. 16, ex. C, p. 17) and a situation

24

where an employee fails to report on two consecutive days does not support the plaintiff's assertion of pretext under the present circumstances. The plaintiff acknowledges the importance of having a full complement of people because of the environment in which they worked. He stated "You've got to get up in there and get down from the time you get in the door until the time you leave. There is no sitting down." (Irby Depo. at 110). The situations are sufficiently different, with the latter one being more burdensome for the defendant and the plaintiff's coworkers.

Regarding the plaintiff's assertion that the defendant "was more liberal in applying [its policies]" toward non-minorities and that Van Hill and Ellis were treated more favorably, the court disagrees that there was any discriminate application of the practice of terminating an employee if he had two consecutive absences without calling. (Doc. 15 at 13). The only deviation, involving Ellis, was discussed previously and is insufficient as a matter of law to defeat the motion for summary judgment. Van Hill's situation does not involve a deviation. He was terminated without explanation when he did not return to work. Although the defendant could have terminated him on February 7, 2000, when he failed to call by 7:15 a.m., the court does not find this sufficient to overcome the motion for summary judgment. In both instances, the employee was terminated. With Van Hill, the defendant never heard from him again. Thus, it was reasonable, if not appropriate, to write his termination report the way it was prepared. In the plaintiff's instance, his girlfriend brought the doctor's excuse, but it was after Lesley made his decision to terminate Irby and hire Grimes. Thus, it was appropriate and accurate to report the facts as delineated in the "Separation Notice." (Doc. 16, Ex. B). This deviation in the manner in which the terminations were recorded is insufficient to create a dispute as a matter of

25

material fact.

Irby relies on *Morrison v. Booth*, 763 F.2d 1366, 1373-74 (11th Cir. 1985), in support of his position concerning company rules and regulations. In *Morrison*, the defendants had bent and even broken certain rules to help two white employees, but did not do as much to assist a black employee. The court stated that where subjectivity is introduced in the employment decision, it has "always looked upon this with increased scrutiny, particularly in a case such as this where flexibility and subjectivity permitted [the defendants] to circumvent [prior court orders and judgments] and promote a white over two higher-ranking blacks." *Id.*, 763 F.2d at 1374. *See also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir. 1998) ("[T]he failure to promulgate hiring and promotion policies can be circumstantial evidence of discrimination. . . . Certainly, it is even more suspicious where it is alleged that established rules were bent or broken to give a non-minority applicant an edge in the hiring process.").

The plaintiff correctly states in his brief that

> [a] fair reading of the [defendant's] written policies indicates that you are in violation of the Group A Work Rules each time you fail to call in one hour before your shift starts, for which you will be subject to the progressive step-discipline set out [therein]. It [(the Group A Work Rules)] also indicates that you can be terminated upon your fourth failure to call in before the start of your shift if you are going to be absent. And it [(the Summation of Possible Termination Conditions)] expressly states you can be terminated if you are absent for **more than** two consecutive days and fail to call in during that time.

(Doc. 15, p. 4) (emphasis in original). He then argues that his situation does not fit into these rules. Specifically, he asserts that the "various rules and policies" do not state "that you will be terminated if you do not get notice to the Company on an excused absence before the afternoon of the second consecutive shift you are scheduled to work." (*Id.*). Irby appears to be asserting

that Lesley, is "molding the rule[s] to cover his termination of Irby." (*Id*. at 4-5). Irby also asserts that Lesley and Newman's contention that a line is drawn in these situations after lunch on the second day, is contrary to the written policy of the company and is contrary to the company practice involving non-minority employees Van Hill and Jerry Ellis. (Doc. 15, p. 12). Thus, according to counsel, it is evidence of the defendant's explanation being pretext.

What the plaintiff has failed to factor into this analysis is that Lesley and Norman's decision to terminate the plaintiff after lunch is consistent with the defendant's "Attendance Policy" which provides that arrival "[f]rom 7:01 a.m. is tardy and anything after 11:00 a.m. is absent." (Doc. 16, Ex. D, ¶ 8). Thus, the court does not find that Lesley and Newman's decision to wait until lunch to make a final determination on whether or not to terminate the plaintiff and Lesley's subsequent hiring of Grimes that afternoon to be contrary to the company practice or policy.

The court has closely examined the facts surrounding each of the purported comparators and the reasonable inferences that may be drawn therefrom, and it finds that they are insufficient under *Combs* to defeat the defendant's motion. Nothing in the record supports a conclusion that Lesley and Newman's termination of Irby at or about the lunch hour of the second day demonstrates pretext. Although, as already discussed, Van Hill's termination was written up differently than Irby's, that is understandable under the circumstances. The supporting documentation on each termination accurately reflects the basis for the termination and the facts surrounding each employee. Similarly, the situation involving Ellis is distinguishable for comparative purposes as previously discussed. Still further, disciplining Brown, Bridges, Grimes, Goble, and Gaylor for tardiness and unexcused absences that do not involve a failure to

27

call in or only involved single-day absences with no call are distinguishable. They should have been and were disciplined under the defendant's progressive discipline policy.[15] The court also sees a distinction in instances when an employee notifies the supervisor that he will not be at work and then fails to bring in a doctor's excuse to explain or justify the absence and the instance at issue where the plaintiff failed to come to work at all for two mornings and did not notify his supervisor. Neither instance demonstrates a strong work ethic, but the latter violation is more serious. This is particularly true in this case where the uncontested evidence demonstrates the employer had stressed the importance of having a full crew ready to work each day.

Finally, in reaching this decision, the court notes two other items. First, the undisputed evidence shows that Lesley contacted the plaintiff's girlfriend and his grandmother in an attempt to determine why he had not come to work. Second, the defendant argues that, under *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1441 (11th Cir. 1998), when the same individual was responsible for hiring, promoting, and ultimately terminating the plaintiff, such "facts may give rise to a permissible inference that no discriminatory animus motivated defendant's actions." However, the court declines to make such an inference in favor of the defendant on its motion for summary judgment. The court in *Williams* stated:

> . . . . Based on our consistent precedent, as articulated in *Combs*, we conclude that "same actor" evidence of the sort introduced in this instance constitutes evidence that a jury may consider in deciding the ultimate issue of intentional discrimination. Evidence that the same actor both hired and fired the plaintiff, in some circumstances, may help to convince a jury that the defendant's proffered legitimate reasons for its decision are worthy of belief; it is the province of the jury rather than the court, however, to determine whether the inference generated by "same actor" evidence is strong enough to outweigh a plaintiff's evidence of

---

[15] Additionally, African-American employee Moore was similarly punished under the progressive discipline policy when he missed work one day and failed to bring an excuse. (Lesley Aff. at ¶ 6).

pretext.

*Id.* at 1443. The court further stated in a footnote:

> It is worth restating that, in this circuit, "evidence of pretext, when added to a prima facie case, is sufficient to create a genuine issue of material fact that precludes summary judgment." *Combs*, 106 F.3d at 1531. It therefore would be inconsistent with our precedent to require a plaintiff in "same actor" cases not only to show pretext but, in addition, to present further evidence to overcome a special inference created by the "same actor" evidence. Such a rule would be contrary to our previous determinations that a plaintiff need not prove discriminatory intent at the summary judgment stage but, rather, must present evidence from which a jury reasonably could infer that the defendant's non-discriminatory justification for its employment decision is pretextual.

*Id.* at 1443 n.14.

## III. CONCLUSION

Premised on the foregoing, the defendant's motion for summary judgment is due to be granted. An order consistent with the findings and conclusions reflected in this Memorandum Opinion will be entered contemporaneously herewith.

The Clerk is directed to serve a copy of this Memorandum Opinion upon counsel for the parties.

**DONE,** this _28th_ day of February, 2002.

_John E. Ott_

**JOHN E. OTT**
United States Magistrate Judge